**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

| | |
|---|---|
| Elijah Pontoon and Lakeya Hicks, | Case No.: 1:15-cv-04697-JMC-PJG |
| Plaintiff(s), | |
| vs. | |
| Chris Medlin, Clark Smith, Penny Shultz, Brian Hall, Charles Barranco, both individually and in his official capacty as the Director of the Aiken Department of Public Safety, Aiken Department of Public Safety and the City of Aiken, | (*Proposed*) <br> **1ˢᵗ AMENDED COMPLAINT** <br> **(Jury Trial Requested)** |
| Defendant(s). | |

        The Plaintiffs, by and through their undersigned counsel, for a Complaint against the

Defendants, do hereby respectfully allege as follows:

**PARTIES**

**Plaintiffs**

        1.        The Plaintiffs, Elijah Pontoon (hereinafter "Elijah") and Lakeya Hicks

(hereinafter "Lakeya") live together, have children together and are citizens and residents of the

County of Aiken, State of South Carolina.

**Defendants**

        2.        The Defendants Chris Medlin (hereinafter "Medlin"), Clark Smith (hereinafter

"Smith"), Brian Hall, Penny Shultz, and Charles Barranco (hereinafter "Barranco") were at all

relevant times acting under color of law and in the course and scope of their duties as employees,

agents, officers and/or Director of Aiken Department of Public Safety (hereinafter "ADPS")

and/or the City of Aiken (hereinafter "City").  All are believed to be citizens and residents of the

County of Aiken, or at least were at the time of the alleged incident. They are sued in their individual capacities for compensatory and punitive damages under Federal law.

3.    The Defendant, Barranco, at all relevant times, was the Director of the Aiken Department of Public Safety. Director Barranco had responsibility for the management, training and operation of the ADPS officers. He is also sued in his representative capacity for the ADPS pursuant to the South Carolina Tort Claims Act that makes the employing entity liable for the torts of its employees (*S.C. Code* §15-78-70). Plaintiffs allege the ADPS and the City of Aiken are liable for the acts and omissions of Medlin, Smith, Hall, Shultz and Barranco for the negligence, gross negligence, recklessness and other liability forming conduct identified in this Complaint.

4.    All officers/Defendants were acting within the course and scope of their official duties as employees of the ADPS and the City of Aiken in relation to this claim.

5.    The Defendants Medlin, Smith, Hall, Shultz and Barranco were at all relevant times acting under color of state law and in the course and scope of their duties as officers for the ADPS and the City of Aiken. They are sued in their individual capacities for compensatory and punitive damages under Federal law.

6.    The ADPS and the City of Aiken are political subdivisions of the State of South Carolina and/or some other type of entity that are responsible for the actions of its agents and employees and that Medlin, Smith, Hall, Shultz and Barranco were agents and/or employees of ADPS and/or the City of Aiken and at all times mentioned herein were acting within the scope and course of their employment.

2

7.    Upon information and belief, ADPS, the City and Barranco had the right and/or power to direct and control the manner in which its employees and/or agents executed their duties and sued under a *Monell* theory of liability.

8.    The negligent and grossly negligent acts, omissions and liability forming conduct of all Defendants includes their agents, principals, employees and/or servants, both directly and vicariously, pursuant to principals of non-delegable duty, apparent authority, agency, ostensible agency and/or respondeat superior and the acts and/or omissions of the above-named Defendants were the direct and proximate cause of the injuries, damages and losses of the Plaintiffs.

9.    All Defendants (public entities and individuals) are also sued under Federal law and Federal Causes of action.

10.    ADPS, Director Barranco, in his representative/official capacity as Director of ADPS and the City of Aiken are sued under State law causes of action.

11.    Punitive damages are not sought against ADPS, Director Barranco, in his representative/official capacity as Director of ADPS and the City of Aiken for the State law (South Carolina Tort Claims Act) causes of action.

12.    Punitive damages are sought against all Defendants sued under Federal law.

## JURISDICTION

13.    Jurisdiction is founded upon South Carolina common law against ADPS, Director Barranco, in his representative/official capacity as Director of ADPS and the City of Aiken, pursuant the South Carolina Tort Claims Act *S.C. Code Ann.* § 15-78-10, *et seq.*

14.    The events which give rise to this litigation occurred in or near Aiken County, South Carolina.

3

15.     Plaintiffs further invoke this Court's concurrent jurisdiction to hear claims arising under the Fourth and Fourteenth Amendments of the United States Constitution and brought pursuant to 42 U.S.C. §§ 1983 and 1988 against the individually named law enforcement Defendants and the employing entities under *Monell* theories of liability.

**JOINT AND SEVERAL LIABILITY**

16.     The above-named non-State Tort Claims Defendants are jointly and severally liable for all damages alleged herein since their acts and omissions, singularly or in combination, are the direct and proximate cause of Plaintiffs' damage, injuries and harms and losses.

17.     Defendants Medlin, Smith, Hall and Shultz are vicariously liable for the acts and/or omissions of the others under federal "by-stander" and "integral participant" theories of liability.

**GENERAL FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS**

18.     On or about October 2, 2014, at approximately 12:23 P.M., Plaintiffs Elijah and Lakeya were riding in their recently purchased Honda Accord through town in Aiken, in Aiken County all in the State of South Carolina.

19.     Lakeya was driving and they were heading east on Richland Avenue.

20.     This location was literally steps from the busy city-center of downtown on a Thursday mid-day afternoon.

21.     While following right on the bumper of Lakeya and Elijah's vehicle, at 12:24 Defendant Medlin activated his blue lights.

22.     Immediately upon being "blue lighted", Lakeya slowed down and turned onto Horry St. where she would not be blocking traffic.

4

23.     At 12:25 Defendant Medlin instructs Lakeya to put the car in park and hand him the keys to the vehicle.

24.     Five seconds later Defendant Medlin asks to see the Bill of Sale for the vehicle.

25.     Eleven seconds later 12:25:21 Defendant Medlin informs Lakeya that the reason he stopped her was because she had a "paper tag on her car".

26.     It has never been the law of this state that the mere purchase of a vehicle creates a presumption that said purchaser is automatically a suspect in a crime. (See *State v. Bultler* (2000))[1]

27.     At 12:25:27 Defendant Medlin demands to see the identification of Elijah despite South Carolina not having any law that requires a non-driving passenger to provide identification and as Defendant Medlin had no reasonable suspicion to believe that Elijah was involved in criminal activity; he was merely a passenger in a vehicle stopped for an alleged motor vehicle violation, he also had no constitutional authority either. (See *Stufflebeam v. Harris,* 2008 U.S. App. LEXIS 7156 (8th Cir. 2008) citing *Hiibel v. Nevada,* 542 U.S. 177 (2004))

28.     Despite not being required to follow Defendant Medlin's unlawful commands, Elijah complied.

29.      At 12:26:05 Defendant Medlin goes back to his vehicle to check on the validity of Lakeya's license.

---

[1] Regarding a vehicle with a 'paper' or 'temporary' tag, the Court held, "*Finally, we refuse to create the suspect presumption in this state that every motorist traveling the highways with a temporary tag is guilty of driving an unregistered or uninsured car and is subject to detention*

30.    At approximately 12:27:06 Defendant Medlin learns that and all of Lakeya's "documentation" and "papers" were in order, and that her license was valid and her bill of sale was correct and proper.

31.    At this point, since all was in order and there was no evidence of any crime, Lakeya and Elijah should have been told they were free to go.

32.    From this point  (12:27:06), any further detainment by Defendant Medlin was unlawful.[2]

33.    Our United States Supreme Court has held that a traffic stop and subsequent search of a vehicle is "unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket." (See *Rodriguez v. United States*)

34.    In this case, the prolonged detention of Lakeya and Elijah was even more egregious as Defendant Medlin did not find <u>any</u> criminal violation, much less one he could have written a warning for as the officer in *Rodriguez* did.

35.    However, at 12:28:36 Defendant Medlin orders Elijah out of the vehicle.

36.    Then at 12:28:50 as Elijah is complying with these (unlawful) commands Defendant Medlin places Elijah in handcuffs.

37.    At 12:29:29, Defendant Medlin walks around to the driver side of the vehicle, opens Lakeya's door and takes her out of the vehicle.

---

[2] It is Plaintiffs' contention that the entire stop was without probable cause and therefore unlawful.  However, Plaintiff is simply examining the stop from this point forward to show further violations.

38.     All during this time Elijah is simply asking what is going on, yet, Defendant Medlin refuses to answer him or in any way calm his fears about why Elijah is being taken out of his vehicle and placed in handcuffs.

39.     At 12:29:47 Defendant Medlin then places Lakeya's hands above her and again Elijah calmly asks Defendant Medlin what is going on.

40.     This time Defendant Medlin responds that he will "Explain it all to you in a minute."

41.     At 12:30:14, Defendant Shultz appears on scene and Defendant Medlin informs her that Lakeya has a valid license.

42.     At this time Defendant Shultz knows or should have known that Lakeya and Elijah had done nothing wrong and that they should be allowed to go free and that any further detainment would be illegal, yet, Defendant Shultz does nothing to prevent further violations of the Plaintiffs' civil rights and becomes further complicit with the illegal actions of Defendant Medlin.

43.     At 12:30:17 Elijah says in a very calm voice that this is just harassment, as he is still handcuffed next to Defendant Medlin patrol vehicle.

44.     Then at 12:30:18, Defendant Medlin, as promised, explains it all to Elijah and Lakeya.

45.     Defendant Medlin states, "What's going on here, because of your past history, I got a dog coming here, gonna walk a dog around the car."

46.     Then again at 12:30:34 Elijah calmly objects to Defendant Medlin that this is harassment.

7

47.     Then as a result, Defendant Medlin puts Elijah actually inside of his patrol car and at 12:30:44 Defendant Medlin tells Elijah, "You gonna pay for this one boy".

48.     At this point neither Lakeya nor Elijah know how Defendant Medlin is "going to make him pay for this" or for what Elijah will be paying.

49.     Then at 12:31:24 Defendant Clark Smith arrives with his K-9 and begins to take his dog around the vehicle.

50.     At this time Defendant Clark knows or should have known that Lakeya and Elijah had done nothing wrong and that they should be allowed to go free and that any further detainment or search would be illegal, yet, Defendant Clark does nothing to prevent further violations of the Plaintiffs' civil rights and becomes further complicit with the illegal actions of Defendant Medlin and Defendant Shultz.

51.     A review of the video from Defendant Medlin's dash-cam shows nothing more than a dog going around the vehicle and simply smelling where Defendant Smith places his hand.

52.     At some point shortly after this, Defendant Hall appears on scene and interacts extensively with Defendants Medlin, Smith and Shultz.

53.     At this time Defendant Hall knows or should have known that Lakeya and Elijah had done nothing wrong and that they should be allowed to go free and that any further detainment would be illegal, yet, Defendant Hall does nothing to prevent further violations of the Plaintiffs' civil rights and becomes further complicit with the illegal actions of the other Defendants.

54.     At precisely 12:32:49 Defendant Medlin, Defendant Clark, Defendant Hall and Defendant Shultz commence with an exhaustive visual and manual search of nearly every square inch of Lakeya and Elijah's vehicle.

55.     At 12:33:22 Defendant Medlin exclaims an affirmative "Uh-huh!", likely a response that he thinks he found the "incriminating evidence" yet no incriminating evidence was ever found.

56.     The search of the vehicle is so intense and thorough, that at 12:36:35 Defendant Medlin tells Defendant Clark (or possibly one of the Defendants Shultz and/or Hall) that he should not "take offense at me searching behind you".

57.     At 12:39:49, Defendants begin searching the entire trunk of the car, yet find nothing.

58.     After more than eleven minutes of exhaustive searching of the vehicle and with the Defendants clearly frustrated and upset that they have not found any incriminating evidence, Defendant Medlin proclaims at 12:43:40, "If he is hiding, he is hiding good."

59.     Then at 12:43:49, Defendant Medlin proclaims, "We are gonna search somebody" to which Defendant Clark (or possibly one of the other Defendants) affirms, "Yeah".

60.     At 12:44:02 Defendant Medlin decides he is going to open the hood of the car and begins searching in the engine compartment of Lakely and Elijah's vehicle.

61.     At the end of this lengthy and exhaustive search and after not finding a single piece of criminal evidence, Defendant Medlin is not going to be denied his bounty and at 12:44:40 instructs Defendant Shultz to "search her real good".

62.     At this point Defendant Clark, Defendant Hall and Defendant Shultz are simply refusing to prevent further civil rights violations at the hand of Defendant Medlin when they knew or should have known there was no legal justification for this illegal extended detention and search and in fact become even more complicit by actively participating in this illegal search and seizure.

63.     All Defendants had numerous opportunities to prevent further abuses but all chose to do nothing but go along with Defendant Medlin's quest to do whatever is required to send Lakeya and Elijah to jail and "make them pay".

64.     At approximately 12:45:30 Defendant Shultz begins to 'search' Lakeya by pulling up her shirt and exposing Lakeya's breasts in broad daylight and in the center of town with Defendant Medlin, Defendant Clark and Defendant Hall standing mere inches away and watching every aspect of the search.

65.     At 12:45:36 during the middle of this humiliating and illegal search of her private areas, Lakeya rightly objects to this horrific and demeaning treatment.

66.     In response to Lakeya's lawful objections, Defendant Medlin retorts and attempts to justify this illegal search with "It's a female officer."

67.     Again, after finding nothing on Lakeya's body after she was "searched real good", Defendant Medlin decides it is time to search Elijah's body and at 12:45:50, he instructs Elijah to get out of the back of his patrol car.

68.     He then tells Elijah to put his hands on top of his head and handcuffs him and then begins searching Elijah's body.

69.    At 12:46:30, Defendant Medlin proclaims, "There is something right here between your legs."

70.    Of course there is nothing illegal between Elijah's legs, but that does not stop Defendant Medlin from further and even more egregiously violating the civil rights of Elijah.

71.    At 12:46:44, Defendant Medlin instructs Defendant Clark (or possibly one of the other Defendants)  to 'put some gloves on' so they he may also violate bodily integrity of Elijah.

72.    At 12:46:55, these purple 'surgical type' gloves can be been seen in the video and are similar, if not the same, as the ones worn by a doctor when performing a medical examination of a patient in a healthcare facility.

73.    At this same time while Defendant Clark and/or Defendant Medlin (or possibly one of the other Defendants) are probing with their hands and fingers into the body cavity and anus of Elijah, Elijah explains they are grabbing his hemorrhoids.

74.     Defendant Clark and/or Defendant Medlin (or possibly one of the other Defendants) then at 12:46:52 replies with "They ain't hemorrhoids, they ain't that hard."

75.     Incredibly at 12:47:15, both Defendants Medlin and Clark (or possibly one of the other Defendants) have their hands and fingers up and inside the anus of Elijah absolutely determined to find something, when one explains to the other how to feel in a certain area of Elijah's body cavity and says "Right straight up in there".

76.    Again, Elijah pleads that this is just a hemorrhoid.

77.    And again at 12:47:48 Defendant Medlin or Clark (or possibly one of the other Defendants) states to Elijah, "If that's a hemorrhoid, that's a hemorrhoid, alright? But that don't feel like no hemorrhoid to me."

78.     Then for the next three excruciating minutes these two Defendants (or possibly one of the other Defendants) continue to probe inside the body cavity and anus of Elijah and continue to insist they are experts as to what hemorrhoids feel like, claim that it is "too hard" to be a hemorrhoid, have their hands and fingers on the "unknown object that is too hard to be a hemorrhoid" yet neither of these two Defendants are able to retrieve this "unknown object".

80.     At no time during this illegal traffic stop and including up to the time of the filing of this Complaint, was the Plaintiff ever aware of any formal medical training of these two Defendants in the field of gastroenterology or proctology so as to be able to form a legitimate opinion as to what would constitute being "too hard to be a hemorrhoid".

81.     At 12:50:27 and after the conclusion of the seemingly unending illegal cavity search of Elijah, Defendant Medlin explains "Now I know you from before….when I worked dope, I seen ya, and that's why I put a dog on ya car."

82.     At no time during this entire time did any of these Defendants find any type of probable cause to warrant even a traffic stop, much less an extremely invasive and illegal strip search of Lakeya and body cavity search of Elijah.

83.     At no time did any of these Defendants attempt to get a valid search warrant for such an intrusive search or even at a minimum to take Elijah to a proper medical facility to have a proper medical professional perform the search.

84.     After the conclusion of this nearly forty (40) minute illegal detainment and illegal cavity search, Defendant Medlin gives both a Lakeya and Elijah a "courtesy warning" but does not indicate what the alleged offense was.

85.     These "courtesy warnings" indicated "Contact Only".

12

86.    After providing Lakeya and Elijah with the Courtesy Warnings, they were finally allowed to leave and go about their way.

87.    This illegal stopping a citizen without any type of probable cause and cavity search absent a search warrant from a judge is not only condoned by but also appears to be part of a *de facto* policy of Defendant Aiken Department of Public Safety and Director Barranco.

88.    Improper and illegal cavity searches also were not only condoned by but also appears to be part of a *de facto* policy of Defendant Aiken Department of Public Safety and Director Barranco.

89.    Irrespective of which officer performed the improper stop for a 'paper tag' and which officer performed the strip and cavity searches of the Plaintiff, at nearly all times during this stop and search, there are at least three (3) other officers there who not only witnessed this improper conduct, they all had the ability and opportunity to stop it at any time but all chose not to do so.

90.    The very next day on October 3, 2014, Lakeya and Elijah went to the Aiken Department of Public Safety to file a complaint against these officers who treated them improperly.  (See Attached and Incorporated Exhibit #1 - Citizen Complaint)

91.    In the formal complaint made by Lakeya and Elijah, Officer Daymon Spann took down their complaint that contained allegations of 'cavity searching' (actually 'rectum', see Ex. #1) on the side of the road, during the middle of the day and right in downtown Aiken.

92.    As this horrifically improper and illegal conduct on the part of these Defendant law enforcement officers is part of an accepted and approved practice and policy of the Aiken Department of Public Safety, this citizens complaint, upon information and belief, was simply

13

tossed in the trash as it did not raise any red flags or appear in any way to be anything out of the ordinary for officers of the Aiken Department of Public Safety.

93.     In support of this allegation, as of at least March 15, 2015, nearly six (6) months after making this formal citizens complaint, Director Barranco had never even been made aware of these allegations of such horrific and illegal conduct.

94.     This failure to notify Director Barranco is, again, because this type of conduct was nothing out of the ordinary for officers of ADPS.

95.     As further support of this allegation, as of the date of the filing of this Complaint, Plaintiffs are unaware of a single Defendant who was fired or even reprimanded by the Director or anyone else at ADPS.

96.     Even further, Defendant Clark, who not only refused to stop further civil rights violations of the Plaintiffs, but was an active participant in these obvious violations, over the past twenty-four (24) years has served ADPS as a Patrol Officer, Field Training Officer, Instructor, Patrol Supervisor, and Narcotics K-9 handler and has helped train and certify hundreds of Law Enforcement Police K-9 teams across the country.

97.     With the extensive knowledge and training of Defendant Clark, as well as his then current position of being an instructor, trainer and supervisor, it is clear that this type of improper and illegal conduct is an accepted, condoned and in fact a trained for policy of the Aiken Department of Public Safety.

98.     The above acts and omissions of all Defendants as set forth herein were at all material times pursuant to the actual customs, policies, practices and procedures of the ADPS and the City.

14

99.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of South Carolina.

100.     All Defendants' conduct herein, was contrary to generally accepted, reasonable law enforcement procedures, training and tactics and caused the damage to the Plaintiffs as laid out in this Complaint.

101.     That acts and/or omissions, cited above, by all Defendants, were the direct and proximate cause of the injuries, damage and losses of the Plaintiffs, including, but not limited to pain and suffering, shock, humiliation, shame, embarrassment and anxiety as well as future pain and suffering, shock, humiliation, shame, embarrassment and anxiety.

102.     The acts and/or omissions of the Defendants violated the following clearly established and well settled Federal and State Constitutional rights of Plaintiffs.

103.     Upon information and belief, despite actual and/or constructive knowledge of this improper and illegal conduct, no investigation by Barranco, ADPS and/or the City was ever undertaken, no one was repremanded, disciplined, training changed, etc., in order to prevent these harms from happening again in the future.

**FOR A FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983 Improper Search & Seizure, Excessive Force & Due Process)**

104.     The Plaintiffs incorporate by reference all previous paragraphs above as if repeated herein.

105.     By the acts and omissions described above, Defendants violated 42 USC §1983, depriving Plaintiffs Lakeya and Elijah of the following clearly-established and well-settled constitutional rights protected by the Fourth and Fourteenth Amendments to U.S. Constitution:

a.    The right to be free from unreasonable searches and seizures as secured by the Fourth and Fourteenth Amendments;

b.    The right to be free from excessive and unreasonable force in the course of search or seizure as secured by the Fourth and Fourteenth Amendments;

c.    The right to be free from the use of unlawful force as secured by the Fourth and Fourteenth Amendments;

d.    The right to be free of unlawful, reckless, deliberately indifferent, and conscience shocking deadly and/or excessive force as secured by the Fourteenth Amendment;

e.    The right to be free from deprivation of liberty and injury without substantive due process and from state created danger as secured by the Fourteenth Amendment;

f.    And in such other particulars as may be learned through discovery.

106.    As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Plaintiffs sustained injuries and damage as otherwise set forth in this Complaint.

107.    The conduct of Defendants in their individual capacities, entitles Plaintiffs to punitive damages and penalties allowable under 42 USC §1983 and the S.C. Code.

108.    Plaintiffs are also entitled to reasonable costs and attorney fees under 42 USC §1988 and applicable South Carolina codes and laws.

109.    While Defendant Medlin may have been the primary actor in this incident, Clark Smith, Hall and Shultz all were by-standers and integral participants in the stop/arrest/search/etc., assisted with the stop/arrest/search/etc. and show of force and thus Plaintiffs allege all are liable under "by-stander liability" and "integral participant" theories of liability.

16

110.    As to "by-stander liability", based on the allegations above, namely that Smith, Hall and Shultz were there on scene and could have refused to participate in the arrest or even stop the stop/arrest/search/etc. but failed to do so, and;

      (1)    Hall, Shultz and Clark Smith knew that a fellow officer was violating Plaintiffs' Constitutional rights;

      (2)    All had a reasonable opportunity to prevent the harm; and

      (3)    All chose not to act;

Therefore, Hall, Shultz and Clark Smith are liable for the actions of the other and Defendant Medlin under the by-stander liability theory.

111.    As to "integral participant liability", Hall, Shultz, Clark Smith and Defendant Medlin were working together to effectuate the search and seizure.

112.    They were all together when Lakeya and Elijah were being improperly stopped, searched and seized.

113.    Chris Medlin, Hall, Shultz and Clark Smith all performed police functions that were integral to the search and seizure, therefore each is liable for the other Defendant's improper search and seizure and excessive use of force as an integral participant to the search and seizure and use of force.

114.    At various times it is difficult to determine exactly which officer assisted and/or performed certain search 'functions' with Defendant Medlin, therefore Plaintiffs allege that upon information and belief Defendants Clark Smith, Hall and Shultz all participated in all aspects of this illegal search and seizure along with Defendant Medlin.

## FOR A SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 Deliberate Indifference)

115.    The Plaintiffs incorporate by reference all previous allegations in the paragraphs above as if repeated herein.

116.    The unconstitutional actions and/or omissions of all Defendants employed by or acting on behalf of these Defendants, upon information and belief, were pursuant to the following customs, policies, practices, and/or procedures of the ADPS, The City and Director Barranco, or stated in the alternative, were directed, encouraged, allowed, and/or ratified by policy makers for ADPS and the City:

a.      To teach, train or tolerate the improper handling, investigation, search, seizure and arrest of a citizen;

b.      To create unnecessary danger and risk of serious harm or death, with deliberate indifference, to citizens within the incorporated city/town limits of a city/town within the County of Aiken;

c.      To cover-up violations of constitutional rights by failing to properly investigate and/or evaluate improper and illegal officer searches, seizures and/or arrests and by ignoring and/or failing to properly and adequately investigate and discipline unconstitutional or unlawful police activity;

d.      To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers and police Department personnel, whereby an officer or member of the Department does not provide adverse information against a fellow officer or member of the Department; and,

e.      To use or tolerate inadequate, deficient, and improper procedures for handling, investigating, and reviewing complaints of officer misconduct, and;

f.      And as may otherwise be learned during discovery in this case.

18

117.    Defendants Barranco, ADPS and the City failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline officers of the ADPS with deliberate indifference to Plaintiffs' constitutional rights, which were thereby violated as described above.

118.    The unconstitutional actions and/or omissions of Defendants Medlin, Clark, Hall and Shultz and other ADPS officers, as described above, were approved, tolerated and/or ratified by policymaking Defendants for the ADPS, The City and/or Director Barranco.

119.    The details of this incident have since been revealed to the authorized policy makers within the ADPS, Director Barranco and the City, and that such policy makers have direct knowledge of the improper actions.  Notwithstanding this knowledge, the authorized policy makers within ADPS, Director Barranco and the City have simply ignored these improper actions, have approved of Defendants' actions, and have made a deliberate choice to endorse this improper and unconstitutional conduct.  By so doing, the authorized policy makers within ADPS and the City have shown affirmative agreement with the individual defendant officers' actions, and have ratified the unconstitutional acts of the individual Defendant officers.

120.    The aforementioned customs, policies, practices, and procedures, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline, were a moving force and/or a proximate cause of the deprivations of Plaintiffs' clearly-established and well-settled constitutional rights in violation of 42 USC §1983, as more fully set forth herein.

121.    Defendants subjected Plaintiffs to their wrongful conduct, depriving Plaintiffs of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for

19

whether the rights and safety of Plaintiffs and others would be violated by their acts and/or omissions.

122.    As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices and procedures of Defendants, Plaintiffs sustained serious harms and losses and are entitled to damages, penalties, costs and attorney fees as set forth, above, including punitive damages against Defendants.

## FOR A THIRD CAUSE OF ACTION
### (42 U.S.C. § 1983 Violation Of Bodily Integrity)

123.    The Plaintiffs incorporate by reference all previous allegations in the paragraphs above as if repeated herein.

124.    Plaintiffs are entitled to relief against the Individual Defendants because they intentionally and unlawfully violated their rights under the Fourth and Fourteenth Amendment to the U.S. Constitution.

125.    Defendants exposed Lakeya in a state of undress to the view of the general public and themselves by pulling up her shirt and exposing her breasts to the general public and themselves as well as violating her rights by touching these very private areas.

126.    Defendants exposed Elijah in a state of undress to the view of the general public and themselves by pulling down his pants exposing his private areas to the general public and themselves as well as violating his rights by inserting their hands into this extremely private area of Elijah.

127.    To be restrained and exposed before strangers, as well and probed and penetrated, is, in itself, absent compelling exigent circumstances, a violation of bodily integrity.

128.     Each of the individual Defendants failed to intervene to restrain the others from violations of the Plaintiffs' constitutional rights, though able to do so.

129.     Defendants misused their power, possessed by virtue of state law and made possible only because Defendants were clothed with authority of state law.  The violations of Plaintiffs' rights, as described above, occurred under color of state law and are actionable under 42 U.S.C. Section 1983.

130.     The foregoing actions of all Defendants were in deliberate disregard of Plaintiffs' rights under the Fourth and Fourteenth Amendment to the U.S. Constitution.

131.     All Defendants are persons under applicable law.

132.     Based on the willful and malicious conduct of these Defendants, as is set out herein, Plaintiffs are entitled to an award of punitive damages against Defendants sued in their individual capacities.

133.     Plaintiffs have been forced to retain counsel to represent them to vindicate their rights.  Pursuant to the provisions of 42 U.S.C. Section 1988, Plaintiffs are entitled to reasonable attorney's fees and costs.

134.     By reason of these wrongful acts, Plaintiffs were subjected to indignity, humiliation, pain and suffering, emotional distress, and held up to scorn and ridicule and the Plaintiffs were otherwise injured now and in the future.

**FOR A FOURTH CAUSE OF ACTION**
**(Negligence & Gross Negligence – State Tort Claims Act)**
**(As to Defendants Barranco in his official capacity, ADPS & City of Aiken)**

135.     The Plaintiffs incorporate by reference all previous paragraphs above as if repeated herein.

21

136.    The Defendants all departed from the duties of care required by law enforcement officers and the agencies that hire, train and employ these officers and were thereby negligent, careless, grossly negligent, reckless and acted in violation of the duties owed to Plaintiffs in that they committed one or more of the following acts of omission or commission, any or all of which were departures from the prevailing duties of care:

    a.    in failing to ensure the safety and bodily integrity of the Plaintiffs;

    b.    in failing to appreciate the conditions that existed on the day in question;

    c.    in failing to adhere to proper law enforcement procedures;

    d.    in failing to properly investigate before effectuating a search and seizure;

    e    in failing to know the law when an officer is effectuating a traffic stop, search and/or seizure;

    f.    in failing to properly train officers on the law;

    g.    in failing to know that law enforcement cannot perform the nature of searches as laid out above without sufficient cause;

    h.    in failing to have in place proper and adequate policies, procedures and protocols for law enforcement officers conducting traffic stops and subsequent searches or, if such policies, procedures and protocols were in place, in failing to use due care to enforce them;

    i.    in such other particulars as may be ascertained through discovery procedures undertaken pursuant to South Carolina Rules of Civil Procedure.

137.    As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness and departure from the duties of care owed by Defendants, Plaintiffs were severely injured and have suffered severe and extreme emotional distress, anxiety, grief and sorrow and other harms and losses for which the Plaintiffs are entitled to recover in an amount to be determined by a jury at the trial of this action.

## FOR A FIFTH CAUSE OF ACTION
### (Common Law Battery)

138.    The Plaintiffs incorporate by reference all previous paragraphs above as if repeated herein.

139.    The Individual Defendants, acting in concert, inflicted harmful and offensive contact upon Plaintiffs with the intent to cause such contact or the apprehension that such contact was imminent, as described above.

140.    Plaintiffs did not invite or consent to the physical contact inflicted upon them by the Individual Defendants.

141.    Based on the willful, outrageous and malicious conduct of these Defendants, as is set out herein, Plaintiffs are entitled to an award of punitive damages against Defendants sued in their individual capacities.

142.    The emotional distress of the Plaintiffs is severe.  They suffered injuries more particularly described above, were subjected to indignity, humiliation, pain and suffering, emotional distress, and held up to scorn and ridicule, and Plaintiffs were otherwise injured now and in the future.

143.    As a direct and proximate result of the negligence, carelessness, gross negligence, recklessness, willfulness, wantonness and departures from professional standards of care as well as the intentional, malicious, deliberately indifferent, outrageous and conscious shocking and unconstitutional conduct by Defendants, Plaintiffs suffered severed harms and losses as outlined above and as such Plaintiffs are entitled to an award of actual damages, punitive damages, attorney's fees and costs.

WHEREFORE, Plaintiffs, respectfully pray for judgment against Defendants for all actual damages, consequential damages and punitive damages in the amount to be determined by a jury at the trial of this case as well as attorney's fees and costs pursuant to 42 U.S.C. § 1983 and 1988 and for such other and further relief as this Court deems just and proper.  Plaintiffs request a jury trial.


**MCGOWAN, HOOD, & FELDER, LLC**


_____
Robert V. Phillips, Esq.
1539 Health Care Drive
Rock Hill, South Carolina 29732
State Bar #:  68458
Federal Bar ID: 07653
(803) 327-7800 - Office
(803) 328-5656 - Facsimile
rphillips@mcgowanhood.com

Rock Hill, South Carolina
February 18, 2016